VENABLE LLP
Thomas E. Wallerstein (SBN 232086)
Christopher J.C. Waldon (SBN 310179)
Whitney L. Tolar (SBN 324112)
Email:   TWallerstein@Venable.com
         CJWaldon@Venable.com
         WLTolar@Venable.com
101 California Street, Suite 3800
San Francisco, CA  94111
Telephone:  (415) 653-3750
Facsimile:  (415) 653-3755

*Attorneys for Plaintiff Apium Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APIUM INC., a Delaware Corporation;<br><br>Plaintiff,<br><br>v.<br><br>AQUABOTIX TECHNOLOGY CORPORATION, a Massachusetts Corporation,<br><br>Defendant. | Case No. 2:20-cv-619<br><br>**PLAINTIFF APIUM INC.'S COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

# PLAINTIFF APIUM INC.'S COMPLAINT

Plaintiff Apium Inc. ("Apium") hereby files this complaint against Aquabotix Technology Corporation ("Aquabotix"):

## I.   INTRODUCTION

1. Apium has developed revolutionary technology that can make autonomous robots aware of, and responsive to, the environment of other robots. Apium has pioneered software, hardware and a suite of applications ranging from distributed ocean mapping to air traffic management.

2. Apium has developed unique algorithms, software, hardware, communications protocols, and logistical know-how that lets robotics and vehicle manufacturers embed "swarming" in their autonomous vehicle systems. Adaptive swarms can use their spatial coverage to guide their behavior. Large numbers of small robots can do the work of "a thousand little hands" with less intrusiveness and risk than single, large robots.

3. Apium has been granted a number of patents, including patents for (1) a navigating craft, configured to operate a least partially submerged in a liquid, for performing drift measurements to track currents in a moving liquid, such as the ocean; (2) a water drone capable of navigating on the surface, or below the surface, of a body of water, monitoring both its own location and depth as well as environmental conditions such as water temperature; and (3) a swarm autopilot for simplified management of large numbers of robotic vehicles; and (4) an automated air traffic control system for unmanned air vehicles which provides for autonomous cooperation between vehicles and creates useful group-level behavior.

4. Having developed the technology and while continuing to do so, Apium sought a business relationship with another company that would be able to manufacture, market, sell and support the water drone vehicle while Apium provided a license to its technology and certain support for the efforts.

5. Aquabotix is a small ocean vehicle company which presented itself to Apium as having the contacts, abilities and expertise to manufacture, improve, integrate new sensors onto, market, sell and support swarming ocean vehicles.

6. In 2018, Apium and Aquabotix agreed they would be collaborative partners and entered into a License Agreement. Apium licensed to Aquabotix certain of Apium's intellectual property and agreed to provide related services to support and enable Aquabotix, including by referring customers. In exchange, Aquabotix was to leverage and employ its contacts, abilities and expertise to find, sign up and support customers resulting in sales from which it would pay royalties to Apium. Additionally, Aquabotix was to pay Apium for sales to customers referred to it by Apium.

7. Rather immediately after entering into the License Agreement, Aquabotix pivoted their efforts and resources, and reoriented their entire business around vehicles deploying Apium technology.

8. Unfortunately, almost immediately upon signing the License Agreement, Apium discovered that Aquabotix suffered from fatal engineering and management shortcomings with limited prospective customer contacts as well.

9. Reeling from its technical and management shortcomings, Aquabotix has refused to pay Apium the royalties required by the License Agreement. Further, contrary to the parties' intention, Aquabotix has now essentially demanded that Apium desist from doing anything which would enable Apium to refer customers as contemplated. In other words, Aquabotix has demanded that Apium refrain from conduct that was contemplated to be one of the mechanisms by which Apium earns its consideration from the License Agreement.

10. Relatedly, Aquabotix compounded its wrongdoing by insisting that, contrary to the intent of the parties and terms of the License Agreement, Apium help conceal Apium's role from the marketplace. This further interferes with Apium's ability to earn a portion of its consideration for the License Agreement.

11.  Faced with Aquabotix's refusal to pay the royalties due, and Aquabotix's insistence that Apium cease taking actions which triggered consideration it was due, Apium tried to discuss the issue with Aquabotix and salvage the relationship, but Aquabotix steadfastly refused. Nonetheless, Aquabotix continues to base its business around Apium's technology.

12.  Apium was left with no choice but to terminate the License Agreement. It now brings this action for breach, and anticipatory breach, of that agreement, as well as for trade secret misappropriation. Apium also seeks declarations that it is not in breach of the License Agreement and that the License Agreement has properly been terminated.

## II.  PARTIES

13.  Plaintiff Apium Inc. is a Delaware corporation with its principal place of business in Glendale, California.

14.  Defendant Aquabotix Technology Corporation is a Massachusetts corporation with its last-known principal place of business in Fall River, Massachusetts. Aquabotix Technology Corporation's principal place of business is not California or Delaware.

## III.  JURISDICTION AND VENUE

15.  This action arises under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836(b) *et seq* in that Defendant has misappropriated Plaintiff's trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce. This Court has original subject matter jurisdiction over Plaintiff's DTSA claim under 18 U.S.C. § 1836(b).

16.  This action is between citizens of different states; plaintiff Apium is a citizen of Delaware and California and defendant Aquabotix is a citizen of Massachusetts. The amount in controversy, without interest and costs, exceeds $75,000. This Court therefore has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 over Apium's claims for breach of contract, anticipatory breach of

contract, and for declaratory judgments that (a) Apium is not in breach of contract and (b) the License Agreement has been terminated.

17. In the alternative, plaintiff's claims for breach of contract, anticipatory breach of contract, and for declaratory judgments that (a) plaintiff is not in breach of contract and (b) the License Agreement has been terminated form part of the same case or controversy as plaintiff's claims under the DTSA. Supplemental subject matter jurisdiction therefore exists under 28 U.S.C. § 1367.

18. This Court has personal jurisdiction over Aquabotix because it consented to personal jurisdiction in this District in the License Agreement, which provides that the "[t]he Parties hereby submit to the exclusive jurisdiction of the state and federal courts located in Los Angeles County, California."

19. Venue is proper in this District for the same reason; *i.e.*, because the License Agreement provides that "[t]he Parties hereby submit to the exclusive jurisdiction of the state and federal courts located in Los Angeles County, California."

20. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to this claim occurred in this District, and a substantial part of intellectual property that is the subject of this action is situated in this District.

### IV. COMMON ALLEGATIONS

#### A. License Agreement

21. On February 1, 2018, Apium and Aquabotix entered into a written License Agreement.

22. Pursuant to the License Agreement, Apium licensed to Aquabotix Vehicle Technology and Swarming Technology. For each of the two types of technology, Apium granted Aquabotix licenses for certain of Apium's patents, licensed products and non-patent intellectual property, including trade secrets.

23. In exchange, Aquabotix agreed to pay a royalty to Apium for sales of products employing the vehicle or swarming technologies. Aquabotix further agreed to pay a higher royalty percentage for sales to customers referred by Apium.

### B. Aquabotix Breaches the License Agreement

24. Aquabotix has publicly confirmed sales of products utilizing technology licensed from Apium. For example, Aquabotix has confirmed a $30,500 sale to the U.S. Navy, another $150,000 sale to the U.S. Armed Forces, and an order for $350,000 to "a military agency of a major Asian country."

25. Aquabotix, however, has incorrectly asserted that such sales are exempt from royalty payments because they are for "testing."

26. The intent of the drafters of the License Agreement was that "units for testing" that are exempt from royalty payments were limited to units that Aquabotix provided without compensation. Thus, Aquabotix is in breach of the License Agreement based on its refusal to pay royalties that are due.

27. Apium has demanded that Aquabotix pay royalties for the units it has sold but Aquabotix has refused.

28. Apium has demanded that Aquabotix confirm that it will not continue to characterize hardware sales as "support[ing] test and evaluation activities" and thereby refuse its obligation to pay royalties.

29. Aquabotix has refused and implicitly has confirmed that it intends to continue to withhold royalties for any future sales which it chooses to characterize as supporting test and evaluation activities for future sales.

### C. Aquabotix Falsely Accuses Apium of Breaching the License Agreement

30. Meanwhile, Aquabotix falsely accused Apium of breaching the License Agreement by selling or offering to sell licensed products.

31. For example, Aquabotix accused Apium of breaching the License Agreement and usurping Aquabotix sales by virtue of Apium's work with the U.S. Office of Naval Research ("ONR").

32. But Aquabotix's accusation is contrary to the agreement of the parties as to Apium's expected conduct, including the agreement's royalty structure that pays Apium a premium for companies that become customers of Aquabotix through Apium's introduction. The ONR project began in 2017, before the Agreement even existed, and its continuation was contemplated by the parties and consistent with the License Agreement.

33. Moreover, on information and belief, Apium's ONR project resulted in Aquabotix making one or more sales to ONR. Thus, not only did Apium not usurp any Aquabotix sales; on information and belief Aquabotix consummated sales for which it owes Apium a royalty (both for the license grant and the referred customer).

34. Apium's role in the ONR project, and earning of referral and sales royalties, was squarely within the contemplation of the parties when the Agreement was executed.

35. Aquabotix also falsely alleged that Apium breached the License Agreement, and would continue to be in breach, whenever it undertakes efforts linked to future potential sales of the Licensed Vehicle Technology.

36. Aquabotix is wrong; evaluating a product for potential future operational use is not a breach of the License Agreement. To the contrary, the activities about which Aquabotix complains are squarely within the intent of the parties as manifested in the License Agreement.

37. Aquabotix also alleged breach of the License Agreement based on purported "sales-related activities" during a project between Apium and the Electric Power Research Institute ("EPRI").

38. The EPRI project also began in 2017, before the License Agreement. Again, Apium's conduct is not only permissible under the License Agreement; it is the kind of conduct by which Apium was intended by the parties to earn fees.

39. Nonetheless, Apium offered to help facilitate Aquabotix to take over the project directly, but Aquabotix refused.

40. Further, Aquabotix falsely alleged that Apium breached the License Agreement by virtue of a paper that Apium's principal prepared for a symposium called AUV 2018.

41. But Aquabotix learned of the paper precisely because the parties were actively collaborating as contemplated by the License Agreement. It was Aquabotix which redirected the paper away from a narrower focus on vehicles and toward the broader issue of swarm robotics in oceanography. The final paper was expressly approved by Aquabotix. In other words, Aquabotix accuses Apium of breaching the License Agreement based on something Aquabotix fully vetted in advance.

42. Similarly, Aquabotix alleges Apium's breach by virtue of a poster displayed during a March 2019 demonstration that was part of the ONR project. But Aquabotix's allegation was based on a draft that Apium sent to Aquabotix for advance feedback. Aquabotix suggested changes in the wording and the parties worked collaboratively until Aquabotix confirmed its approval of the poster.

43. Aquabotix also falsely alleges that Apium has failed to deliver technology that meets the License Agreement's required technical specifications. But Apium's technology fully complies with all the specifications set forth in the License Agreement.

D. **Aquabotix Refuses to Remedy Its Breaches or Withdraw its False Accusations**

44. On August 26, 2019, Apium served Aquabotix with a written "Notice of Breach" alerting Aquabotix that it was in breach of the letter and spirit of the License Agreement, by, among other things, refusing to pay royalties due.

45. On October 2, 2019, Apium served Aquabotix with a further written "Notice of Breach," explaining in detail Apium's position and rebutting Aquabotix's allegations of Apium's breaches.

46. Apium invited Aquabotix's good faith consideration and explained that Apium has made an enormous investment – not just of money, but also time and energy – with regard to its relationship with Aquabotix.

47. Conversely, however, Apium warned that Aquabotix's persistence would result in Apium terminating the License Agreement.

48. Since that time, Apium has at least twice repeated its offer to discuss the parties' differences and resolve them short of litigation. Aquabotix refused.

49. On January 21. 2020, Apium served Aquabotix with a Notice of Termination of the License Agreement.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

50. Apium repeats and incorporates by reference all the allegations above.

51. Apium and Aquabotix entered into a valid and enforceable contract; *i.e.*, the License Agreement.

52. Apium has fully performed all conditions, covenants and promises to be performed on its part with regard to the License Agreement.

53. As set forth above, Aquabotix has materially breached the License Agreement.

54. As a direct and proximate cause of Aquabotix's breaches, Apium has suffered economic losses and general, specific, direct, indirect and consequential damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Anticipatory Breach of Contract)

55. Apium repeats and incorporates by reference all the allegations above.

56. Apium and Aquabotix entered into a valid and enforceable contract; *i.e.*, the License Agreement.

57. Apium has fully performed all conditions, covenants and promises to be performed on its part with regard to the License Agreement.

58. As set forth above, Aquabotix implicitly has confirmed that it intends to continue to withhold royalties for any future sales which it chooses to characterize as supporting test and evaluation activities for future sales.

59. Aquabotix's withholding of royalties for sales which it chooses to characterize as supporting test and evaluation activities for future sales violates the License Agreement and constitutes an anticipatory breach of the License Agreement.

60. As a direct and proximate cause of Aquabotix's anticipated breaches, Apium will suffer economic losses and general, specific, direct, indirect and consequential damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**(Declaratory Judgment of Termination of License Agreement)**

61. Apium repeats and incorporates by reference all the allegations above.

62. The License Agreement entered into by Apium and Aquabotix permits Apium to terminate the agreement if it provides Aquabotix with notice of breach and Aquabotix does not remedy the breach within 120 days.

63. Aquabotix breached the License Agreement as set forth above and otherwise.

64. Apium provided Aquabotix with notice of breach, and notice of anticipatory breach, but Aquabotix did not remedy the breach.

65. Not sooner than 120 days after Apium provided notice to Aquabotix of its breach, Apium terminated the License Agreement.

66. On information and belief, Aquabotix denies that it has breached the License Agreement, denies that its reasonable anticipated future actions will breach

the License Agreement and denies that Apium is permitted to terminate the License Agreement.

67. In light of Aquabotix's dispute, an actual case or controversy exists as to whether Apium was permitted to terminate the License Agreement and therefore whether the License Agreement remains in force and effect.

68. Apium wishes the freedom to grant licenses of its Vehicle Technology and Swarming Technology to other partners, and therefore seeks a declaration from this Court that Apium's termination was effective and that the License Agreement no longer remains in force and effect.

69. To the extent the License Agreement does not remain in force or effect, Aquabotix is infringing Apium's patents, misappropriating Apium's trade secrets and breaching the confidentiality provisions of the License Agreement which survived termination with regard to the obligation to return and not further employ or disclose Apium's confidential information.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract)

70. Apium repeats and incorporates by reference all the allegations above.

71. Apium and Aquabotix entered into a valid and enforceable contract; *i.e.*, the License Agreement.

72. Apium has fully performed all conditions, covenants and promises to be performed on its part with regard to the License Agreement.

73. Due to Aquabotix's breaches and anticipatory breaches, Apium terminated the License Agreement.

74. Aquabotix therefore is required to return and cease using all non-patent intellectual property that had been licensed to it from Apium.

75. Apium has demanded that Aquabotix cease using and return all non-patent intellectual property that had been licensed to it from Apium, but Aquabotix has refused.

PLAINTIFF APIUM INC.'S COMPLAINT                                    CASE NO.  2:20-cv-619

76. Aquabotix therefore is in breach of the License Agreement.

77. As a direct and proximate cause of Aquabotix's breaches, Apium has suffered economic losses and general, specific, direct, indirect and consequential damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

**(Violation of Defend Trade Secrets Act)**

**(18 U.S.C. §§ 1836 et seq.)**

78. Apium repeats and incorporates by reference all the allegations above.

79. As a result of substantial investment therein, Apium has developed trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.

80. Apium's trade secrets relate to and enable both Vehicle Technology and Swarming Technology. The trade secrets are the scientific, technical and engineering information such as the compiled swarm source code, software (for swarm behaviors, vehicle control, radio communication, swarm management, and user interface), design / manufacturing information (the schematics, parts lists, mechanical drawings, molds, vehicle design knowhow, manufacturing techniques), and compiled lists of suppliers and customers.

81. Apium took reasonable measures to keep its trade secrets confidential. For example, Apium is diligent with electronic data protection including password protection, use of 2 factor authentication, and limiting data repository access only to approved employees. Apium keeps active NDA's with its customers and employees, labels sensitive documents as "Apium Proprietary" information, and shreds sensitive discarded documents. Core swarm software is diligently guarded and protected in the form of a precompiled library.

82. Apium's trade secrets derive independent economic value, actual and potential, from not being generally known to actual or potential competitors, and not being readily ascertainable by them through proper means.

83. Apium permitted Aquabotix access to the trade secrets via the License Agreement, and Apium required Aquabotix to maintain the confidentiality of the trade secrets.

84. Apium has terminated the License Agreement and Aquabotix no longer is permitted access to or use of Apium's trade secrets.

85. Notwithstanding termination of the License Agreement, Aquabotix wrongfully maintains access to Apium's trade secrets, and continues to use the trade secrets over Apium's objection.

86. As a direct and proximate cause of Aquabotix's breaches, Apium has suffered economic losses and general, specific, direct, indirect and consequential damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

**(Declaratory Judgment of Apium's Lack of Breach of License Agreement)**

87. Apium repeats and incorporates by reference all the allegations above.

88. As set forth more fully above, Aquabotix has accused Apium of breaching the License Agreement.

89. Apium, however, has fully performed all conditions, covenants and promises to be performed on its part with regard to the License Agreement, and Apium has not breached the License Agreement.

90. An actual case and controversy exists with regard to whether Apium has breached the License Agreement.

91. Apium seeks a declaration from the Court that it has not breached the License Agreement as alleged by Aquabotix.

## PRAYER FOR RELIEF

WHEREFORE, Apium prays for judgment from this Court as follows:

1. That the Court declare, adjudge and decree that Aquabotix breached the License Agreement with Apium;

2. That the Court declare, adjudge and decree that Aquabotix anticipatorily will breach the License Agreement with Apium;

3. That the Court award damages to Apium, including interest, in an amount to be determined at trial;

4. That the Court declare that Apium's termination of the License Agreement was effective and that the License Agreement no longer remains in force and effect;

5. That the Court enjoin Aquabotix from using, selling or offering to sell Apium's Vehicle Technology, Swarming Technology or any products employing either of those technologies;

6. That the Court award to Apium its attorneys' fees and costs of suit; and

7. That the Court grant such other relief as it deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff Apium hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

**VENABLE LLP**

Dated: January 22, 2020

By: /s/ *Thomas E. Wallerstein*
Thomas E. Wallerstein
Christopher J.C. Waldon
Whitney L. Tolar
*Attorneys for Plaintiff*
*Apium Inc.*